## Commonwealth vs. Steven Stewart.

Barnstable. April 10, 2009. - August 14, 2009.

Present: Marshall, C.J., Spina, Cowin, Botsford, & Gants, JJ.

*Homicide. Joint Enterprise. Witness,* Hostile witness, Refusal to testify. *Evidence,* Hostile witness, Leading question, Impeachment of credibility, Joint venturer, Prior misconduct. *Practice, Criminal,* Capital case, Opening statement, Argument by prosecutor, Instructions to jury.

At the trial of an indictment charging murder in the first degree, the judge erred in permitting the Commonwealth to question a witness who refused to take an oath and in allowing the Commonwealth to ask him leading questions (to which he responded, "No comment"), which permitted the Commonwealth to place its entire case before the jury in the form of an impermissible interrogation without competent testimony from a witness, thereby denying the defendant due process and his right to cross-examine the witness; because the questions went to the heart of the case and were not cumulative of other evidence, the error required reversal of the defendant's conviction. [529-534]

Discussion of issues that might arise at the retrial of an indictment charging the defendant with murder in the first degree on theories of extreme atrocity or cruelty and deliberate premeditation, as a principal and as a joint venturer, including the admissibility of statements of various witnesses as statements made during a joint venture [534-537], the propriety of certain aspects of the prosecutor's opening statement [537-538] and closing argument [538-540], the admissibility of the defendant's other bad acts [538], and the correctness of the judge's instructions to the jury on joint venture [540-541].

Indictment found and returned in the Superior Court Department on August 13, 2003.

The case was tried before *Richard F. Connon,* J.

*John M. Thompson* for the defendant.

*Thomas G. Shack, III,* Assistant District Attorney (*Robert D. Moriarty,* Assistant District Attorney, with him) for the Commonwealth.

Cowin, J. A jury in the Superior Court convicted the defendant of murder in the first degree on theories of extreme atrocity or cruelty and deliberate premeditation. The jury were instructed

on both principal and joint venture liability and returned a general verdict. The defendant appeals from his conviction on a variety of grounds, which we discuss *infra*. We reverse the defendant's conviction because a witness was permitted to answer questions without being sworn and because the same witness was allowed to answer "No comment" to leading questions that contained highly prejudicial information. We address other claims of error concerning issues that may arise at a retrial.

1. *Facts*. We briefly describe the thrust of the Commonwealth's case based on the evidence and reasonable inferences therefrom, leaving the details of the evidence to later discussion of specific issues. Frances Carriere, the wife of Edmond Carriere, Jr.,[1] was stabbed to death in the bathroom of her home on Head of the Bay Road in the Buzzards Bay section of Bourne at approximately 5:30 P.M. on January 3, 1980, by the defendant, who was part of a joint venture murder for hire. The other participants in the venture were the victim's husband and Richard Grebauski.[2] Grebauski was present at or near the murder scene. He was friends with both the husband and the defendant, and the defendant did work for Grebauski.

A next-door neighbor of the victim heard cars "drive up" at about 6:05 or 6:10 P.M. on the evening of the murder. He heard two doors slam and "possibly the trunk being shut." The victim's body was found at about 8 P.M. on January 3, lying on the floor, her head against the bathtub, clutching human hair in her left hand. She had four stab wounds and a small bruise on her neck consistent with pressure from a hand or someone holding her neck. She died from multiple stab wounds to her chest.[3]

According to Stephen Tracy, the defendant's employer in 1980, the defendant said that Grebauski might have a job for him "to do" someone's wife. Tracy stated in addition that there was a period in 1980 when the defendant was "not around." When Tracy asked the defendant where he had been, the defendant said

[1]We refer to Edmond Carriere, Jr., as Carriere or the victim's husband, and to Frances Carriere as the victim.

[2]Richard Grebauski was also indicted for murder in the first degree, but died in an accident prior to trial.

[3]Despite extensive testing, no physical or trace evidence of any evidentiary value was found at the scene.

that "he had some things to do and he did them." The defendant had been missing "in the time frame" of the murder. At that same point, Tracy recalled that the defendant "had outfitted an apartment with some furniture. He just recently got married."

Two to three months before the murder, while the victim and her husband were in the process of being divorced, the victim's husband offered a "couple of thousand dollars" to some friends to murder his wife. The friends were Charles Berryman, Russell Breault, possibly David Phinney. The friends did not take the offer seriously.

Richard Grebauski was David Mello's drug dealer and the two men committed "a lot of crimes . . . [s]elling drugs, stealing, auto theft." On January 3, 1980, Mello called Grebauski for drugs, which Grebauski brought. The two men drove to Head of the Bay Road in Buzzards Bay. At about 6 P.M., Grebauski got out of the car there, left Mello with his drugs, and said he would be right back. Grebauski returned about one-half hour later and sped off. Mello noticed nothing unusual about Grebauski's appearance and saw no blood on him.

Timothy Blanchette, the defendant's son, said he first met his father in 1998 when he was eighteen years old. The two men would meet occasionally, and one night when they were drinking, the defendant said that he got $10,000 for "some lady that he had killed down the Cape . . . Buzzards Bay." He said that "it was the easiest $10,000 he ever made, and he continued to laugh about it." The defendant said that the killing took place in the bathroom: "He said she got out of the tub and he stabbed her."

2. *Discussion.* a. *Questioning of Robert Hoeg.* We reverse the conviction because the Commonwealth was permitted to question a witness, Robert Hoeg, who refused to take an oath, and because the Commonwealth was allowed to ask him leading questions to which he responded, "No comment." The leading questions essentially permitted the Commonwealth to place its entire case before the jury in the form of an impermissible interrogation without competent testimony by a witness.

Robert Hoeg, a coworker and friend of the defendant, gave a statement to the police and testified before the grand jury. In both his statement and grand jury testimony, Hoeg essentially

set forth the entire scenario of the murder as recounted to him by the defendant. At the time of trial, Hoeg was serving a sentence of life without parole for a conviction of murder in the first degree. (That conviction was unrelated to the present case.) When Hoeg was brought to court, the Commonwealth informed the judge out of the presence of the jury that Hoeg would claim the privilege against self-incrimination. An appointed lawyer determined that Hoeg had no such privilege, and at side bar, the judge so informed Hoeg.

In the presence of the jury, the clerk recited an oath, but Hoeg did not respond. The judge asked Hoeg whether he intended to answer questions, and Hoeg said no. With the jury not present, the judge ordered Hoeg to testify, but he refused. The judge stated that, because Hoeg was serving a life sentence, it would be futile to hold him in contempt. He declared Hoeg a hostile witness and permitted the Commonwealth to question him, but said that the Commonwealth could not put him on the stand simply to impeach him or use his silence as inconsistent testimony for purposes of introducing his grand jury testimony. See *Commonwealth* v. *McAfee*, 430 Mass. 483, 489-492 (1999) (party may not call witness who he knows beforehand will not offer relevant testimony solely for purpose of impeaching witness). The judge ruled also that Hoeg's failure to take an oath "would only affect his credibility."

The jury were brought in; Hoeg took the stand but again refused to be sworn. The prosecutor asked Hoeg if he killed the victim, and he responded that he did not. In response to other questions, Hoeg denied knowing the victim, her husband, or their son. Hoeg answered another question by stating that he "[n]ever" lived in Buzzards Bay. He stated also that he knew the defendant and that he lived in the penal institution at Shirley.

The prosecutor then asked Hoeg approximately twenty questions in respect to a statement that Hoeg had given a State trooper concerning the murder and regarding Hoeg's grand jury testimony. To each question, Hoeg responded, "No comment." These leading questions put forth the Commonwealth's entire theory of how the murder was committed. For example, the prosecutor asked if Hoeg had told the grand jury that the defendant told Hoeg that Grebauski had a friend who wanted his wife "taken care of"

because they were going through an ugly divorce and that Grebauski offered the defendant $5,000 "to take care of" the friend's wife. Other examples of the prosecutor's questions to Hoeg were whether Hoeg had stated to the grand jury that the defendant had told him that his brother drove him to the Cape; that "he entered the woman's home . . . through a slider or sliding glass door in the back of the home . . . [; that] the woman was in the shower; [that] he attacked her in the shower and stabbed her; . . . [that] he could hear the woman's heart pumping the blood out of her[, o]ut of the wounds . . . [; and that] she was fighting him off and grabbing and clawing at him."

Defense counsel objected to the questions to no avail. The judge overruled the objections on the ground that, because Hoeg had answered some questions, the Commonwealth could continue to question him in an effort to impeach him. The judge stated he would not have permitted any questioning if Hoeg had not answered any inquiries. At the end of Hoeg's testimony, the judge instructed the jury that "[q]uestions from lawyers, no matter how damaging, are not evidence." In his final instructions, the judge repeated that "questions themselves are not evidence. The answers are evidence. And so, the mere fact that a question was asked in and of itself is not evidence in this case."

Hoeg should not have been permitted to answer questions for two reasons. First, he refused to take an oath or affirm the truthfulness of his testimony in any other manner. Although a witness may affirm in ways other than by taking an oath, see G. L. c. 233, §§ 17-19; *Adoption of Fran*, 54 Mass. App. Ct. 455, 467 (2002) (adult witness may affirm duty to testify truthfully), a witness must swear or affirm, or the witness may not testify. When Hoeg refused to take an oath, the judge was faced with a difficult situation, but the solution he chose was an impermissible one. The judge should have ordered Hoeg to take the oath by swearing or affirming, and held him in contempt for failing to do so. Even if the threat of a contempt finding, or a contempt finding itself, may not have brought about compliance, the judge was not permitted to waive the requirement of an oath.[4]

Second, the entire procedure denied the defendant due process.

---

[4] We recognize, as did the judge, that a finding of contempt and the accompanying sanction are unlikely to have impact on an inmate already serving a sentence of life without parole.

The leading questions put by the prosecutor[5] were effectively transformed into evidence, and the ambiguous "no comment" responses cannot reasonably be construed as denials of the propositions contained in the questions. The Commonwealth effectively communicated to the jury its version of the events without competent evidence, at least from Hoeg, that the events described in the prosecutor's questions had in fact occurred. Nor did the judge's instruction that questions are not evidence remedy the problem. The problem arose both with the questions themselves and with the ambiguity of the "no comment" responses, and the jury were not instructed to ignore the responses.

The situation is similar to that in *Commonwealth* v. *Benoit*, 32 Mass. App. Ct. 111, 115-117 (1992). In the *Benoit* case, the prosecutor called a witness to whom the defendant (the witness's brother) had allegedly confessed. The prosecutor was aware that the witness would deny that the confession had been made and so informed the judge. After the witness answered four preliminary questions about his relationship with the defendant, all questions were devoted to the alleged conversation in which the defendant related the details of the crime. As expected, the witness denied any such conversation. The court stated:

> "The fact that the prosecutor in this case disclosed the [denial of the conversation] to the judge beforehand . . . establishes the absence of bad faith, but does not save the day, for the error is evident and the harm to the defendant was too great. . . . [W]hether [the witness] was believed or not, his testimony came to nothing. That was because there was no purpose to [the witness's] testimony other than to place before the jury the questions the prosecutor put to him to provide the foundation for the admission of his alleged prior inconsistent statements. Thus, by one means or another, the prosecution provided the jury with . . . opportunities to hear that which it was otherwise unable to bring before the jury, the defendant's alleged confession." (Footnotes omitted.)

*Id.* at 116-117.

---

[5]The judge should not have permitted the prosecutor to put leading questions. Indeed, after the initial "no comment," the judge should have anticipated what developed, and stopped the questioning.

In addition, the defendant was effectively denied his right to cross-examine the witness. In *Douglas* v. *Alabama*, 380 U.S. 415, 416-419 (1965), the defendant's accomplice had been tried and convicted, and was called as a prosecution witness while his appeal was pending. The accomplice invoked his privilege against self-incrimination and refused to answer questions. Nevertheless, the prosecutor was permitted to read to the jury a confession by the accomplice. The United States Supreme Court reversed the conviction, holding that the defendant's "inability to cross-examine the accomplice as to the alleged confession plainly denied him the right of cross-examination . . . ." *Id.* at 419. So too, in this case, Hoeg's refusal to testify denied the defendant the right to cross-examine him after the prosecutor's use of leading questions put the damaging facts before the jury.

In certain limited circumstances, we have held that a witness's prior grand jury testimony is admissible as substantive evidence. In *Commonwealth* v. *Daye*, 393 Mass. 55, 72-75 (1984), we concluded that prior inconsistent grand jury statements are admissible as probative evidence if specific conditions are met. There must be an opportunity for effective cross-examination of the witness at trial. *Id.* at 73. If the witness has no memory of the events to which the statement relates, this requirement of opportunity for meaningful cross-examination is not met. *Id.* In addition, the statement must clearly be "that of the witness, rather than the interrogator," i.e., the statement must not be coerced and must be more than a "mere confirmation or denial of an allegation by the interrogator," *id.* at 74-75. Finally, there must be other evidence tending to prove the issue, i.e., corroboration. *Id.* In the present case, Hoeg's "no comments" denied any opportunity for meaningful cross-examination. For that reason alone, his grand jury testimony did not qualify under the *Daye* limitation. Nor was it established that Hoeg's answers at the grand jury were his own words rather than those of the interrogator.[6]

There was timely objection to the questions put to Hoeg, and permitting the Commonwealth to pursue this course was certainly

---

[6]Because we conclude that Hoeg's statements were inadmissible under State law, we need not address any potential issue regarding the possible applicability of *Crawford* v. *Washington*, 541 U.S. 36 (2004). See *Commonwealth* v. *Burgess*, 450 Mass. 422, 431 n.6 (2008).

not harmless. The questions went to the heart of the case. They were not cumulative; there was no other evidence concerning how the murder occurred. Thus, we cannot be sure "that the error did not influence the jury, or had but very slight effect . . . . [We] cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error . . . ." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983). Because the Commonwealth may choose to retry the defendant, we consider other issues raised by the defendant's claims of error that may arise at a retrial.

b. *Joint venture statements.* The defendant contends that several hearsay statements were admitted improperly as statements made during a joint venture.[7] "[O]ut-of-court statements by joint criminal participants are admissible against the others if the statements are made both during the pendency of the cooperative effort and in furtherance of its goal." *Commonwealth* v. *Allison*, 434 Mass. 670, 675 (2001), quoting *Commonwealth* v. *Clarke*, 418 Mass. 207, 218 (1994). For a joint venturer's statement to be admissible, the Commonwealth must establish the existence of the joint criminal venture by a preponderance of the evidence, independent of the out-of-court statements, *Commonwealth* v. *McLaughlin*, 431 Mass. 241, 246 (2000), that is, the existence of the joint venture must be established by evidence other than the statements. See *Commonwealth* v. *Allison, supra.*

Here, there was sufficient evidence independent of the out-of-court statements to establish a joint venture among Carriere (the victim's husband), Grebauski, and the defendant. Two to three months before the murder, the victim's husband offered money to his friends to kill his wife. She lived in Buzzards Bay and was killed in her bathroom in January, 1980. Years later, in 1998, the defendant admitted to his son that he had been paid $10,000 to kill a woman in Buzzards Bay and that he killed her in her bathroom. "Around" the time of the murder, the defendant told his employer, Tracy, that Grebauski might have a job

---

[7] The defendant claims ineffective assistance of counsel on the basis that his attorney failed to object to admission of these statements. Because of our disposition of the case, we need not consider this contention.

for him "to do" someone's wife. Grebauski was a friend of the victim's husband and of the defendant, and the defendant occasionally did work for Grebauski. This evidence permitted a finding that the defendant was involved in a joint venture to kill Carriere's wife, with Grebauski acting as the middleman between Carriere and the defendant. See *Commonwealth* v. *McLaughlin, supra* at 247.

Once there is evidence that permits a finding that a joint venture existed, and the jury so find, statements of any of the joint venturers made during the course of the venture and in furtherance of it may be considered against the defendant; there is no hearsay problem because the statement of each joint venturer is equivalent to a statement by the defendant. See *Commonwealth* v. *White,* 370 Mass. 703, 708 (1976). The statement must of course be relevant to an issue in the case. See *Commonwealth* v. *Cyr,* 425 Mass. 89, 93-94 (1997); *Commonwealth* v. *Pleasant,* 366 Mass. 100, 102-103 (1974). With this background, we consider each of the statements that the defendant claims was improperly admitted.

The defendant maintains that Carriere's solicitation of his friends to murder his wife was not admissible because the statements were made two to three months before the murder and before the joint venture was formed. The fact that the statement was made prior to the formation of the joint venture does not render it inadmissible. The statement was probative of Carriere's intent to kill his wife and by inference his later action on that intent. See *Commonwealth* v. *McLaughlin, supra* at 247-248 (joint venturer's statement that he had "contract of a husband on a wife," made fifteen months before joint venture formed, relevant to later joint venture). Nor was the statement hearsay in any event. "[H]earsay is an extrajudicial statement offered to prove the truth of the matter asserted." *Commonwealth* v. *Keizer,* 377 Mass. 264, 269 n.4 (1979). Carriere's statement to his friends was not offered to prove any fact contained in that statement, but only to prove that Carriere was seeking to hire someone to kill his wife. See *Commonwealth* v. *Rodriquez, ante* 215, 220 (2009).

The defendant claims that David Phinney's statement to Berryman that he (Phinney) could not return to Massachusetts from Florida because he was Carriere's "alibi" should not have been

admitted. On the day of the murder, Berryman telephoned Carriere's Florida home to speak to Phinney. Berryman wanted Phinney to return to Massachusetts because the two men were supposed to start a siding job. Phinney said he could not come back "because he was his [Carriere's] alibi." We agree that the statement was improperly admitted. There was no other evidence that Phinney was a participant in the joint venture, and so the statement, although relevant, was inadmissible hearsay.

The defendant argues that statements by Carriere in December, 1979, and January, 1980, to his daughter, Linda McCraney, were not admissible because they were not made during the pendency of the joint venture or in furtherance of it. In December, 1979, and January, 1980, McCraney saw her father in Florida with her younger sister, Ginger, who was thirteen years old. Ginger was living with her mother, but stayed with Carriere in Florida through Christmas and beyond the time she was to return to school on Monday, January 3, 1980. When McCraney questioned her father concerning why he did not return to Massachusetts to take Ginger back to school, her father responded by swearing at her and telling her it was none of "[her] God damned business." Her father referred to her mother as a "whore" and said she wanted to divorce him so "she can get . . . the house on Buzzards Bay." According to McCraney, her father believed that the State would pay him a lot of money because of a road that was being built in the area of the family home and said, "I offered your mother $10,000 to just go away."

The statements by Carriere to his daughter in Florida concerning not returning his other daughter to Massachusetts in time for school were properly admitted. It was Carriere's plan to remain in Florida in order to establish an alibi, and his statements to his daughter, which communicated that he would be in Florida at the time of the murder, were made in furtherance of that venture. They were made at just about the time that the victim was killed when the joint venture was ongoing, and they were relevant to establish Carriere's state of mind, i.e., that he was planning to bring about the death of his wife. Carriere's remarks to his daughter about the victim's desire for a divorce were also admissible, because even though the witness did not identify a specific date when these statements were made, the thrust of the evidence is

that they were made in the December-January period. Even if they were made at an earlier time, they were nevertheless admissible to help establish the motive for the joint venture. See *Commonwealth* v. *McLaughlin, supra.*

Sometime "a while after the murder" (but less than a year after it), Grebauski and Mello drove by a house at or near Head of the Bay Road, and Grebauski said, while pointing to a house, "I offed that bitch." The defendant claims that Grebauski's statement to Mello that he "offed that bitch" was hearsay because it was not made during the course of the joint venture or in furtherance of it. If a joint venture has ended, the actions or statements of one joint venturer cannot be admitted against another. *Commonwealth* v. *Andrews*, 403 Mass. 441, 452 (1988). But when there are efforts to conceal the crime, the venture continues. *Commonwealth* v. *Angiulo*, 415 Mass. 502, 519 (1993). The inquiry focuses not on whether the crime has been completed, but on whether a joint venture was continuing. *Commonwealth* v. *Braley*, 449 Mass. 316, 322 (2007). The implication of Mello's testimony was that this statement was made shortly after the murder. Absent clear indication that the venture had ended, it is reasonable to infer that concealment of the venture was ongoing. However, Grebauski's statement to Mello was not an effort to conceal the crime; indeed, it was just the opposite. It revealed the crime to someone who was not a member of the joint venture. Nor was there evidence that the statement related to the purpose of the joint venture. Thus, the statement was not made in furtherance of the joint venture and should not have been admitted.

Another statement by Mello, to the effect that Grebauski said that he (Grebauski) "got pulled into the police station for this lumber thing" the day after the murder and was questioned about a murder, did not further the venture in any way, and was not properly admitted.

c. *Opening statement.* The defendant objects to the prosecutor's opening statement, in which he predicted that the defendant's son, Blanchette, would testify that the defendant told him that he killed a woman on the Cape, and "[i]t was the first time he had killed somebody." Such testimony was not elicited from Blanchette or any other witness. At a retrial, if the prosecutor anticipates such testimony, it is for the trial judge to determine

in context whether the probative value of this ordinarily admissible statement is outweighed by its prejudicial impact. See *Commonwealth* v. *Lewin (No. 2)*, 407 Mass. 629, 631 (1990).

d. *Other evidence of bad acts.* The defendant argues that the testimony of his son, Blanchette, that the defendant attacked him and a friend about a debt improperly portrayed the defendant as a violent, assaultive person, and was inadmissible as evidence of a prior uncharged crime or other irrelevant violent behavior. See *Commonwealth* v. *DeMarco*, 444 Mass. 678, 681-683 (2005). The assault occurred when Blanchette and a friend had a dispute over money with the defendant. As a result of the fight, Blanchette was convicted of assaulting his father with a baseball bat. Blanchette told the police about his father's admission to the murder only after he had been charged with this offense.[8] In the circumstances of the present case, where defense counsel in his opening statement referred to the attack on Blanchette as part of the defense theory in order to discredit Blanchette by showing a motive to lie (stemming from this attack by the defendant), Blanchette's testimony on the subject was not improper. See *Commonwealth* v. *Haraldstad*, 16 Mass. App. Ct. 565, 571-572 (1983).

e. *Closing argument.* The defendant challenges five remarks in the closing argument. First, the defendant contends that, despite the fact there was no evidence of strangulation, the prosecutor suggested that the victim had been stabbed while she was being strangled. The medical examiner had testified that there was no strangling, but that the marks on the victim's neck indicated that "[a]t some point, there was something solid there pressing on it," and that the marks were consistent not with strangulation, but with "somebody holding the neck." A former criminal investigator from the Barnstable County sheriff's department testified that the marks on the victim's neck "would be consistent with pressure from a hand or something." Given that evidence, the prosecutor's characterization of a strangulation was an unfortunate choice of words and should be omitted at any retrial.

The defendant suggests that the prosecutor misstated evidence,

---

[8]Blanchette denied receiving any benefit or reward in the assault and battery by means of a dangerous weapon case for assisting the police in the present case.

"put[ting] words into the mouth of a witness . . . [and] alter-[ing] the meaning of the witness's testimony," when, in referring to Tracy's testimony regarding the defendant's statement that "[s]ome guy wanted [him] to do his wife," the prosecutor asked, "Is there any question in your mind what 'to do' his wife meant?" See *Commonwealth* v. *Auclair*, 444 Mass. 348, 359 (2005). There was nothing improper. Based on the evidence that the defendant admitted killing the victim, the prosecutor did no more than suggest a reasonable inference that "to do" meant "to kill."

The defendant asserts that the prosecutor impermissibly asked the jury to speculate about the meaning of a statement attributed to the victim's boy friend, Rodney Burrill. Burrill was the person who discovered the body, and immediately thereafter, he stated to the police, "I knew she would be killed." The defendant maintains that there was no evidence indicating how Burrill obtained this knowledge and that the prosecutor improperly suggested that Burrill had learned the information because Carriere had been asking people to kill his wife. The defendant did not object at trial to the admission of this statement. Because the statement was in evidence, the prosecutor could refer to it. See *Commonwealth* v. *Amirault*, 404 Mass. 221, 238 (1989). The question remains whether it was a reasonable inference from the evidence that Burrill was aware that Carriere was soliciting people to kill his wife. It was obvious from the evidence that Carriere had broached his plan to several people. Had there been evidence that Burrill was in contact with any of those people, the inference could have been warranted. On the state of the record, however, the inference was impermissible. If the issue recurs at retrial, the propriety of such an argument will depend on the state of the evidence.[9]

The defendant contends that the prosecutor improperly shifted to the defendant the burden of proving his innocence by stating, "There may be no trace evidence that places [the defendant] there . . . but there is nothing that excludes him from being there; that proves he wasn't there . . . ." See *Sandstrom* v. *Montana*, 442 U.S. 510, 524 (1975). Of course, the defendant need not offer any evidence. However, the challenged statement

[9]It not having been raised by the defendant, we do not pass on whether Burrill's state of mind on the subject is relevant to any issue in the case.

came at the end of a portion of the closing that reviewed the evidence, including the defendant's confession to his son. The prosecutor then mentioned the testing that had been performed on various items and the reasons why the Commonwealth was unable to conduct other tests. He concluded with the above-challenged statement. The entire line of argument was made in response to the defendant's closing, which emphasized that no evidence at the murder scene linked the defendant to the crime. In context, the argument was permissible. The prosecutor said in effect that there was powerful evidence of the defendant's guilt; that the Commonwealth performed forensic testing despite that; and that testing, while not inculpating the defendant, did not exonerate him. While the argument was close to the line, the prosecutor essentially argued that the steps the Commonwealth had taken neither placed the defendant at the scene nor established that he was not there. See *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 231 (1992).

Finally, the defendant maintains that the prosecutor unfairly characterized him as "an unfeeling man" by stating that "he hadn't even acknowledged [his son Timothy Blanchette] from birth." Although the statement was supported by the evidence, it was an improper attempt to cast the defendant in a bad light. See *Commonwealth* v. *Daley*, 439 Mass. 558, 562-565 (2003). There was no connection between the evidence that the defendant had no relationship with his son for eighteen years and his killing of the victim in this case. There was plainly no basis for an inference that the defendant's lack of feeling for his son made it more likely that he killed the victim. The statement's only purpose was to persuade the jury impermissibly that the defendant's bad character indicated that he was more likely to have committed the crime.

f. *Judge's instructions.* The judge properly set out the law on joint venture, and there is no contention otherwise. He then instructed as to joint venture statements:

> "If you find sufficient evidence to support a fair inference that a joint venture existed, you can consider evidence of the acts and statements of each of the participants against the defendant.
>
> "You may do so, however, only with respect to actions

or statements occurring when the joint venture existed or made when the joint venturers were acting to conceal the crime and that are *relevant to the joint venture* of which you found the defendant an actor or actors or declarant or declarants were members" (emphasis supplied).

The defendant objects that the instruction did not contain language that the statements of coventurers could be considered only if made "in furtherance of" the joint venture in question. See *Commonwealth* v. *Silanskas*, 433 Mass. 678, 693 (2001). The defendant is correct. The judge's reformulation of the usual instruction did not explain adequately that the purpose of the statement must be to further, i.e., assist the accomplishment of, the joint venture.

*Judgment reversed.*