NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12154

COMMONWEALTH  vs.  KERON PIERRE.

Suffolk.     May 4, 2020. - December 15, 2020.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
& Kafker, JJ.[1]

Homicide.  Evidence, Prior misconduct, Testimony before grand
    jury, Prior inconsistent statement, Impeachment of
    credibility, Cross-examination, Consciousness of guilt.
    Witness, Impeachment.  Practice, Criminal, Capital case,
    Assistance of counsel, Cross-examination by prosecutor.

Indictments found and returned in the Superior Court
Department on January 12, 2010.

The cases were tried before Jeffrey A. Locke, J.

Alan J. Black for the defendant.
Paul B. Linn, Assistant District Attorney, for the
Commonwealth.

GAZIANO, J.  On March 29, 2009, Chantal Palmer, Shakora

Gaines, Anthony Peoples and Sharon Headley were sitting in a

_____

[1] Chief Justice Gants participated in the deliberation on
this case prior to his death.  Justice Lenk participated in the
deliberation on this case prior to her retirement.

Nissan vehicle outside an after-hours establishment in Boston when five men, at least three of whom --the defendant, Devon Boswell, and Nigel Nichols -- were armed, walked around the corner of the building and in front of the vehicle. They approached the driver's side and attempted to converse with the women. The women did not respond. The defendant asked the driver for her telephone number. When she said she would not provide it, he pushed aside another of the men and fired nine rounds into the vehicle, killing Palmer, Gaines, and Peoples. Headley, who had been in the front passenger seat, ducked when the shooting started and later was able to jump from the vehicle and run behind a parked van where she remained until the men had gone.

The defendant was indicted on three counts of murder in the first degree, one count of armed assault with intent to murder, and unlawful possession of a firearm. He was tried and convicted of all charges. In this direct appeal, the defendant claims prejudicial error in the admission of prior bad act evidence and the substantive use of prior inconsistent grand jury testimony by one trial witness. The defendant contends as well that he received constitutionally ineffective assistance when his trial counsel declined to pursue the use of certain impeachment evidence against one witness after his initial objection. In addition, the defendant argues that the

prosecutor's impermissible cross-examination of the defendant as to why he had not returned to the United States to defend himself from suspicion of having been the shooter violated his rights under art. 14 of the Massachusetts Declaration of Rights and impermissibly shifted the burden of proof from the Commonwealth to him.  The defendant also asks us to exercise our extraordinary authority under G. L. c. 278, § 33E, to reduce the verdict or to grant him a new trial.  For the reasons that follow, we affirm the defendant's convictions and decline to exercise our authority to grant extraordinary relief.

1.  Background.  We summarize the facts presented to the jury in the light most favorable to the Commonwealth, leaving particular facts for later discussion as necessary to address specific arguments.

a.  Commonwealth's case.  Two witnesses -- Headley, who had been in the Nissan but escaped uninjured, and Boswell,[2] who had known the defendant for about one year and who formed part of

---

[2] Boswell testified pursuant to a cooperation agreement.  In exchange for his testimony, the Commonwealth agreed to dismiss indictments charging Boswell with a nonfatal shooting in Boston that took place in March 2010, a year after the events at issue here.

In addition, Boswell entered into an immunity agreement with Rhode Island authorities to testify in a double homicide. In that case, Nichols was charged with shooting into an occupied vehicle occupied by three people, killing two of them.  Rhode Island authorities granted Boswell immunity from prosecution for another nonfatal shooting.

the group of five at the victims' vehicle -- gave detailed and comprehensive testimony about the shooting and its immediate aftermath. Other partygoers described parts of the events in less detail but consistent with these descriptions.

The events took place outside an unofficial after-hours establishment run by a husband and wife from their home in the Dorchester section of Boston. They hosted parties on Friday and Saturday evenings in the basement of their home, where they also sold take-out food. The parties generally continued until about 3 A.M. Guests parked where they could find space in the residential neighborhood.

In the early morning hours of March 29, 2009, two groups of guests converged at the house. The first group, which included Gaines, Palmer, Peoples, Headley, and Terrence Johnson, arrived in a white Nissan driven by Palmer. The three women and Peoples had been at a club in Boston where they encountered Johnson, a close friend of Peoples, and all five decided to go to the after-hours party. Palmer parked around the corner from the house, and the occupants of the Nissan walked to the house and went into the basement. The second group, consisting of the defendant and two of his friends, Devon Boswell and Nigel Nichols, arrived at some point after having driven from a club in Providence. Boswell drove his own vehicle, while Nichols and the defendant arrived in Nichols's vehicle. The two groups did

not interact with each other while they were in the house; indeed, none of the people in the first group had ever met the defendant before the night of the shooting.

Gaines, Palmer, Peoples, and Headley left the party sometime around 4 A.M.  As they were getting ready to leave, they realized that Johnson was no longer with them.  They walked to the Nissan, and Palmer then drove to the front of the house and stopped in the middle of the street to wait for Johnson.  Headley was in the front passenger's seat, Peoples was in the rear passenger's seat behind Palmer, and Gaines was seated behind Headley; Peoples intended to telephone Johnson to come meet them.

As they pulled up in front of the house, a group of at least five men, including the defendant, Boswell, and Nichols, came around the corner from the party and approached the driver's side of the white Nissan; the defendant was wearing a sleeveless white T-shirt, and Boswell was wearing a gray "hoodie."  The men, at least three of whom were carrying firearms (the defendant, Boswell, and Nichols), attempted to talk to the women.  Boswell, who was standing between the front and rear doors on the driver's side, put his hands on the Nissan.  The defendant was close to and slightly behind Boswell.

The group of men attempted to start a conversation with the women by asking, "What's good ladies?" or "What's good girls?"

The women did not respond.  From the rear seat, Peoples told the men, "They're good, they're straight."  The defendant asked Palmer for her telephone number, but she declined to provide it.  Peoples then asked the men, "Can you please back up off the car?"  When they did not move, he said, "Back the fuck off the car."

The defendant responded by pushing Boswell out of the way and saying to Peoples, "What, n--?  We're strapped."  He then produced a handgun and pointed it at Peoples for three or four seconds, while Peoples looked at him.  When Peoples turned his head away, the defendant shot him, then turned the weapon and fired at Palmer in the front seat.  The defendant leaned in and continued firing, while Boswell ran to his vehicle as the defendant continued shooting.

When she heard the first shot, Headley ducked; from her vantage point in the front passenger's seat, she had been able to see only the shooter's torso.  She told police that the shooter had been wearing a white T-shirt and added that she could see his arms so the shirt was sleeveless.  After the shots ended, Headley was able to jump out of the vehicle and run for cover (a parked van), where she stayed a few minutes before returning to the after-party to get help.  She was examined at the scene and found to be physically unharmed, but when she got

to the police station, she discovered that one of the bullets had passed through her leather jacket, leaving two bullet holes.

The medical examiner later determined that Palmer had sustained four bullet wounds to her neck and torso, which, combined, caused her death; Gaines had sustained four bullet wounds to her torso and her arm, with the wound to her torso being fatal; and Peoples had sustained five bullet wounds, of which the wound to his torso was fatal.  Most of the injuries moved from the left to the right sides of the victims' bodies; all of the shell casings and projectiles found in the vehicle or next to it had been fired by the same .40 caliber weapon.

On March 30, 2009, the day after the shootings, at the defendant's request, his fiancée's mother purchased for him an airline ticket to Trinidad, leaving on April 2 and returning on April 24, 2009.  The defendant had a son in Trinidad, and he generally visited the country two times a year for three to five weeks.  His fiancée's mother testified that the defendant had been paying her for the ticket over time, starting in March, for a planned trip in April.  After a while, she realized that the defendant had not returned as scheduled, although he assured her during their telephone calls that he would be returning.  Ultimately, the defendant remained in Trinidad until he was extradited to the United States in 2013 so that he could be tried in this case.

   b.  <u>Defendant's case</u>.  The defendant testified on his own behalf.  He said that he had gone to the after-hours party with Nichols and Boswell, a party he had attended frequently, and had arrived after 3 <u>A</u>.<u>M</u>.  He had not had a firearm with him, nor had he been in possession of a firearm on any previous occasion.  The defendant had arrived at the party wearing a black button-down shirt with a purple pattern, but he had taken it off while waiting in line to buy food because it had been hot in the basement and someone named "Yellows" had spilled a drink on it.  The defendant had been wearing a white tank top under his dress shirt.  At some point, Boswell joined the party.  He, too, was wearing a white "body-builder T-shirt."

   Once he received his take-out food, the defendant put on his black shirt and told Nichols he was ready to leave.  Nichols was busy talking to a woman and did not want to leave at that point.  Boswell also remained in the basement.  Nichols gave the defendant his keys, and the defendant left to wait in Nichols's car.  The defendant sat in the vehicle, with the heat on, listening to music, until Nichols returned approximately fifteen minutes later.  While the two were driving away, Nichols telephoned Boswell using the defendant's cellular telephone because his had no charge.  Nichols asked Boswell in an agitated fashion, "What's that all about?", and then "Well, is it finished?"  Despite the defendant's questions and Nichols's

evident agitation, Nichols refused to explain the nature of the problem.

After the defendant had been extradited, Boswell telephoned him at the jail to explain that Boswell falsely accused him of being the shooter because Boswell mistakenly had believed that he could not be extradited from Trinidad. Boswell said that he had been forced to implicate the defendant in order to get out of a situation.

2. Discussion. The defendant asserts that errors in certain of the judge's evidentiary rulings (on the introduction of prior bad act evidence and the substantive use of a witness's grand jury testimony); ineffective assistance by defense counsel because he failed to pursue efforts to introduce specific impeachment evidence; and improprieties in the prosecutor's cross-examination of the defendant require a new trial. We do not agree.

a. Defendant's prior possession of a firearm. The defendant argues that the judge erred in allowing the introduction of testimony by two witnesses regarding the defendant's possession of a firearm on two occasions months before the shootings during games of cards or dominos. The prosecutor filed a motion in limine to permit these witnesses to testify. In one instance, he pointed it at the witness's face in a "joking" manner.

The first witness testified that at a long-standing game of dominos in October or November of 2008, while sitting at the table, the defendant was "toying with a gun" and then pointed it "directly at" her. The witness "got on his case for pointing it directly at [her], playing around," as did other players. She described the firearm as "a black handgun" that was not a revolver. While couched in layman's terms, her description made clear that she understood the distinction. Immediately following this testimony, the judge instructed the jury that they could consider the evidence only to show "the defendant's access to or familiarity with handguns," and not to show "the defendant's character or to his propensity to commit crime."

The second witness, who, like the first, had met the defendant at a game of dominos a few months earlier, testified that, "[a] couple of months" before the shooting, the defendant had been playing cards in the kitchen. During the game, the defendant took out and displayed "a black handgun." Immediately after this testimony, as well as in the final charge, the judge gave proper limiting instructions.

The defendant sought to exclude the testimony as improper propensity evidence. He argued that it would be used only to show a propensity to commit crimes; it portrayed him as violent and law-breaking; and that there was no evidence the particular firearm had been used in the shootings. The judge found that

the evidence of the defendant's prior possession of a firearm "similar in appearance and design to the weapon at issue in this case" was admissible to demonstrate "the defendant's access to and familiarity with firearms."  The judge determined as well that the probative value of the evidence outweighed its potential for unfair prejudice, and therefore allowed the Commonwealth's motion.

Evidence is not admissible if its purpose is solely "to show the defendant's bad character or propensity to commit the charged offense."  See Commonwealth v. Holley, 478 Mass. 508, 532 (2017), quoting Commonwealth v. Snyder, 475 Mass. 445, 456 (2016).  Evidence related to prior bad acts may be admissible, however, for other purposes, including "to show that the defendant ha[d] the means to commit the crime."  See Commonwealth v. Ridge, 455 Mass. 307, 322 (2009), citing Commonwealth v. Anderson, 448 Mass. 548, 560 (2007).

Evidence regarding a weapon that "could have been used in the course of a crime is admissible, in the judge's discretion, even without direct proof that the particular weapon was in fact used in the commission of the crime."  Holley, 478 Mass. at 533, quoting Commonwealth v. McGee, 467 Mass. 141, 156 (2014).  See Commonwealth v. Corliss, 470 Mass. 443, 449-450 (2015) (trial judge properly allowed introduction of evidence of defendant's access to firearm that could have been used to commit robbery).

Evidence of previous possession of a firearm other than the one used to commit the crime also may be admissible "to show that the defendant had access to or knowledge of firearms." See McGee, supra at 157, citing Ridge, 455 Mass. at 322-323.

Nonetheless, "[e]ven if the evidence is relevant to one of these other purposes, the evidence will not be admitted if its probative value is outweighed by the risk of unfair prejudice to the defendant." Commonwealth v. Crayton, 470 Mass. 228, 249 (2014). Because the defendant objected at trial, we consider the introduction of this evidence for abuse of discretion. See Commonwealth v. Tassinari, 466 Mass. 340, 353 (2013).

The judge determined that the evidence of a firearm that was "similar in appearance and design to the [murder] weapon" was admissible to demonstrate "the defendant's access to and familiarity with firearms." The probative value of this evidence, he concluded, outweighed its potential for unfair prejudice. See McGee, 467 Mass. at 157. There was no abuse of discretion in the judge's decision to allow the introduction of evidence concerning a weapon that could have been the one used in the shooting, and to show more generally that the defendant had access to and familiarity with firearms.

The defendant argues that the evidence had little probative value because "it was undisputed that the two separate incidences involving two separate guns involved guns that were

not the murder weapon."  "Where a weapon definitively could not have been used in the commission of the crime, [this court has] generally [has] cautioned against admission of evidence related to it."  Commonwealth v. Barbosa, 463 Mass. 116, 122 (2012). This is because the prejudicial impact on the jury is likely to outweigh the "tenuous relevancy of evidence of a person's general acquaintance with weapons."  Commonwealth v. Toro, 395 Mass. 354, 358 (1985).

The defendant's characterization of the evidence, however, overstates its nature.  At trial, the prosecutor indeed did concede that there was no evidence that the weapons the witnesses saw in the defendant's possession at the dominos games were the same as the one used in the shootings.  That, however, would not have been the proper test even if the weapon had been admitted for the purpose of showing access to the means to have committed the killings.  See McGee, 467 Mass. at 156.  The purpose for which the judge allowed the testimony to be admitted did not depend on which particular weapon or type of weapon had been in the defendant's possession; the purpose was merely to show the defendant's knowledge of and access to firearms.

Moreover, while there was no evidence that the firearm that the two witnesses saw was the murder weapon, equally there was no evidence that it was not, and, based on the descriptions of the black firearm that was not a revolver, it could have been

the one used in the shootings in this case.  Both witnesses described the weapon the defendant had been holding as black, and one explained that it was not a revolver.  The parties stipulated that the weapon used in the shootings, which was introduced in evidence, was a black semiautomatic handgun.  Thus, the weapon the witnesses saw in the defendant's possession months before the shooting generally matched the description of the firearm at issue in this case.  Contrast Commonwealth v. Collazo, 481 Mass. 498, 501-502 (2019) (error to permit admission of evidence that defendant possessed second firearm that could not have been murder weapon); Commonwealth v. Imbert, 479 Mass. 575, 585 (2018) (error where weapon definitely could not have been used in commission of offense).

In addition, any risk of unfair prejudice was reduced by the Commonwealth's limited use of the evidence.  The prosecutor did not dwell on the defendant's handling of the weapon either during the evidentiary portion of the trial or at closing argument.  The relevant testimony by both witnesses consists of approximately five transcript pages.  Neither the witnesses' testimony, nor the prosecutor's characterization of the defendant's behavior while he was displaying the firearm at the dominos games, suggested that it had been threatening.  Rather, the prosecutor observed that "they saw [the defendant] with a gun on a prior occasion.  Forget it.  Forget about the gun on

the prior occasion.  It's only offered for a limited purpose anyway."

Thus, there was no abuse of discretion in the judge's decision to allow the introduction of the evidence of the defendant's possession of a firearm on two prior occasions.

b.  Prior inconsistent statements.  The defendant contends that the judge abused his discretion in allowing the Commonwealth to introduce Johnson's grand jury testimony as substantive evidence.  The defendant argues that introduction of the grand jury minutes as substantive evidence was error because the Commonwealth did not establish the necessary prerequisites for the substantive admission at trial of the prior inconsistent statement before the grand jury, as set forth in Commonwealth v. Daye, 393 Mass. 55, 73-74 (1984).

When a witness gives testimony at trial that is inconsistent with that witness's prior testimony before the grand jury, the testimony before the grand jury may be admitted substantively at trial if two conditions are met:  (1) "the witness can be effectively cross-examined as to the accuracy of the statement," and (2) "the statement was not coerced and was more than a mere confirmation or denial of an allegation by the interrogator."  Commonwealth v. Maldonado, 466 Mass. 742, 754-755, cert. denied, 572 U.S. 1125 (2014), quoting Daye, 393 Mass.

at 75.[3]  See Mass. G. Evid. § 801(d)(1)(A) (2020).  Prior
inconsistent statements are not limited to instances of direct
and clear contradiction.  Rather, prior testimony is
inconsistent if, when, "taken as a whole, either by what it says
or by what it omits to say, [it] affords some indication that
the fact was different from the testimony of the witness."  See
Daye, supra at 73 n.16, quoting Commonwealth v. Simmonds, 386
Mass. 234, 242 (1982).

Johnson testified before the grand jury that he had left
the after-hours party in the basement and came around the corner
of the house to see an African-American man in a white
sleeveless shirt shooting into a vehicle, and that sparks were
"flashing" in front of the man while this was happening.  When
Johnson was approached about testifying at the defendant's
trial, he requested immunity because a portion of his trial
testimony would be that he had not been truthful before the
grand jury.  The Commonwealth, as a result, granted Johnson
immunity for his testimony at the defendant's trial.

---

[3] In Commonwealth v. Daye, 393 Mass. 55, 75 (1984), this
court explained that the Commonwealth must present "other
evidence tending to prove the issue . . . presented."  In
Commonwealth v. Clements, 436 Mass. 190, 193 (2002), however, we
clarified that, although the first two requirements concern
admissibility, the need for corroborating evidence is relevant
to the separate question of the sufficiency of the evidence.

On direct examination, Johnson testified that he never saw the man in the white T-shirt shooting at the vehicle stopped in the middle of the road. Rather, Johnson explained, his grand jury testimony actually had been an account of the incident that had been provided to him by Alvin Leacock,[4] which Johnson then told to a friend. On cross-examination, Johnson testified that he had lied to the grand jury under pressure, because he was being threatened with incarceration if he did not explain that he had seen the man in the white T-shirt shooting into the vehicle that had been standing in the road. Johnson explained that police had told him that if he did not tell the grand jury "what I told my friend," the police "were going to put me in jail."

The defendant argues that Johnson could not be cross-examined effectively because Johnson did not remember the underlying events, and also did not remember testifying before the grand jury.[5] "When the witness at trial has no recollection

_____

[4] At the time, Leacock's father was dating Johnson's aunt, and Johnson described Leacock as his "cousin."

[5] Although counsel raised this issue at trial, this does not appear to be a case where the judge found that the witness was feigning a lack of memory of the underlying events. See Commonwealth v. Ferreira, 481 Mass. 641, 660-661 (2019); Commonwealth v. Andrade, 481 Mass. 139, 142 (2018). The record on this point is somewhat confusing. The prosecutor initially asked for a finding of loss of memory. When the prosecutor showed Johnson his grand jury testimony, however, Johnson, while asserting that he did not remember his testimony before the

of the events to which the statement [before the grand jury] relates, [the] requirement of an opportunity for meaningful cross-examination is not met." Commonwealth v. McGhee, 472 Mass. 405, 422 (2015), quoting Daye, 393 Mass. at 73. The defendant overstates Johnson's lack of memory about that night. Certainly, there are places in the testimony where Johnson's recollection is uncertain, and where he made broad statements such as, "I don't remember that night." Johnson was clear, however, on the key points for effective cross-examination: his reasons for having lied to the grand jury and his statement that he did not see what he claimed to have seen.

Moreover, during his trial testimony, Johnson also testified to important details about the night of the shooting. He said, inter alia, that Palmer had picked him up and they had driven to the after-hours party in her white vehicle. At the party, Johnson became separated from Peoples and the three women, and Leacock came to get him from the basement. Johnson testified that he and Leacock were walking toward the front of the house and saw a group of people standing around the white vehicle; the driver's side was closer to the party house. None

_____

grand jury, agreed that he must have said what was written in the transcript; the prosecutor then indicated that he was satisfied with the testimony. Because Johnson effectively had adopted his grand jury testimony, the prosecutor stopped pursuing any finding as to a loss of memory.

of the people standing near the automobile was wearing a sleeveless white T-shirt.  Johnson testified that he then heard gunshots and ran behind the house with Leacock.

While case law is scant concerning the question of just how detailed a recollection of the underlying events a witness must retain in order effectively to be cross-examined, Johnson's testimony certainly does not evince "no recollection."  See Daye, 393 Mass. at 73.  More importantly, Johnson's trial testimony was sufficient to delineate what Johnson had been able to see on the night of the shooting, as well as the accuracy of Johnson's grand jury testimony.  See id. (opportunity for effective cross-examination existed where witness "testified as to the circumstances of his presence at the scene of the shooting and as to the accuracy of his statement to the grand jury").  Thus, it was not only possible that Johnson theoretically could have been effectively cross-examined; the transcript shows that counsel actually did so.

The second Daye criterion that must be established is that the prior inconsistent statement be "'that of the witness, rather than the interrogator,' i.e., the statement must not be coerced."  Commonwealth v. Stewart, 454 Mass. 527, 533 (2009), quoting Daye, 393 Mass. at 74-75.  The judge reviewed the grand jury transcripts and determined that the Commonwealth had met this requirement.  The judge explained,

"I find that the manner of questioning and the answers given by Mr. Johnson, the manner in which he testified, are such that the Commonwealth would be permitted under the principles of Commonwealth v. Daye to make use of the grand jury testimony. . . . I find that the information given was not merely the response to either suggestive or leading questioning as to critical events, but rather the questions put to Mr. Johnson appear fairly open-ended, allowing the witness to provide his version of what he had done and observed."

The defendant does not dispute the judge's finding. Thus, the defendant's claim that Johnson's grand jury testimony was that of the interrogator is unavailing.

Moreover, the issue of coercion was not raised prior to the judge's ruling that Johnson's grand jury testimony was admissible substantively. On cross-examination, Johnson asserted that police had threated to put him in jail if he did not testify to the version of events supplied by Leacock. The defendant did not ask the judge to reconsider his ruling in light of this testimony concerning coercion. See Commonwealth v. McDonagh, 480 Mass. 131, 137-138 (2018) (counsel was required to raise basis for objection in order to bring asserted error to judge's attention). The judge, therefore, was deprived of an opportunity to assess the validity of Johnson's claim that his grand jury testimony had been the product of police coercion. See Commonwealth v. Randolph, 438 Mass. 290, 293-294 (2002).

In any event, Johnson's grand jury testimony that the shooter had been wearing a white sleeveless T-shirt could not

have caused prejudice for the defendant, regardless of its admissibility.  It was cumulative of Headley's and Boswell's testimony concerning the shooter's clothing.  Johnson did not otherwise recognize or identify the defendant as the person in the white shirt.  The testimony also effectively was cast into doubt on cross-examination, where Johnson said repeatedly that his grand jury testimony had been a coerced lie.

    c.  <u>Failure to impeach witness concerning pending criminal charges</u>.  Leacock testified before the grand jury that, towards the end of the after-hours party, as Palmer, Peoples, Headley, and Gaines were waiting in their vehicle, Leacock went back down to the basement to retrieve Johnson and bring him to his friends.  Leacock testified that, immediately before he heard the shots fired, he saw a man in a white shirt standing near the vehicle.  Leacock did not see the man actively shooting, and did not notice whether the white shirt had sleeves.  On cross-examination, Leacock testified that many people at the party had been wearing white T-shirts.

    Well after his grand jury testimony, Leacock was indicted on charges of money laundering and conspiracy to defraud the United States in conjunction with an incident in which he tried to bring $400,000 into the United States, undeclared, through Logan Airport.  Before Leacock was to testify at the defendant's trial, the Commonwealth moved to exclude any evidence of this

indictment for impeachment purposes. The prosecutor noted that Leacock would not be testifying under any agreement with the Commonwealth and had not been offered any promises, rewards, or inducements for his testimony. While the judge initially appeared to agree with the Commonwealth, he then mused that it could be appropriate to allow impeachment with the then-pending money laundering charges to show that Leacock "might feel that he might obtain some sort of benefit [from the Federal government] as a result of testifying favorably . . . ." See McGhee, 472 Mass. at 424-425 (evidence of pending criminal charges is admissible for impeachment purposes within trial judge's discretion in order to demonstrate witness's bias or motive to curry favor with government).

Defense counsel stated that, as long as Leacock's testimony at trial was consistent with his grand jury testimony, counsel would not raise the issue of the Federal prosecution. Defense counsel did not attempt to impeach Leacock with the implication that, by his testimony, he might be attempting to obtain a favorable result in his Federal case. Counsel also did not ask the judge to reconsider his ruling on impeachment, despite the judge's previous reservation of a decision on the question. There is no suggestion that Leacock's trial testimony was inconsistent with his grand jury testimony; to the contrary, the record indicates that, at trial, both the defendant and the

Commonwealth were satisfied with Leacock's testimony and viewed it as consistent with his grand jury testimony.

The defendant claims generally that the preceding events violated his rights to confront the witnesses against him under the Sixth Amendment to the United States Constitution; it is unclear whether, in his view, it was the action of the judge, his counsel, or some combination that infringed upon that right. Although the particular legal basis upon which the defendant intended to rely is unclear, all of the conceivable bases are unavailing.

The decisions the defendant cites in support of his arguments are inapposite because, in each, the judge made a definitive ruling that limited or eliminated the defendant's right to cross-examine. See Davis v. Alaska, 415 U.S. 308, 310-313, 317-320 (1974) (judge barred cross-examination on juvenile witness's probation status); Pointer v. Texas, 380 U.S. 400, 401, 406-407 (1965) (full deprivation of right to cross-examine absent witness where previous testimony of that witness, which had not been subject to cross-examination, had been introduced); Alford v. United States, 282 U.S. 687, 693-694 (1931) (prejudicial error to preclude cross-examination showing witness was incarcerated and therefore could have motive to curry favor). Here, by contrast, the judge ultimately did not rule on trial counsel's initial opposition, which counsel in any event

did not pursue when Leacock's testimony was introduced. For this reason, the defendant's claim properly sounds as one for ineffective assistance of counsel, either for precipitously withdrawing the objection, or for not cross-examining Leacock about his then-pending Federal case.

When evaluating a claim of ineffective assistance of counsel in a case subject to review under G. L. c. 278, § 33E, we review for a substantial likelihood of a miscarriage of justice. See Commonwealth v. Ayala, 481 Mass. 46, 62 (2018). "Impeachment of a witness is, by its very nature, fraught with a host of strategic considerations, to which [this court] will, even on § 33E review, still show deference" (citation omitted). Commonwealth v. Moore, 480 Mass. 799, 815 (2018).

Here, Leacock's testimony was of limited value to the Commonwealth, particularly because he did not claim to have seen the shooting, nor could he state whether the shirt the shooter had been wearing had had sleeves. Leacock also testified, contrary to the Commonwealth's theory, that many other individuals also had been wearing white T-shirts that night. Any effectiveness from using the pending Federal charges to impeach Leacock would have been substantially undercut by the fact that Leacock testified before the grand jury months prior to his arrest on Federal charges, and Leacock's testimony at trial was entirely consistent with his grand jury testimony.

Nothing in the record suggests Leacock's testimony was given in order to curry favor with Federal or State officials.  Further, there is no indication that, had Leacock's testimony not been before the jury, its absence would have had any impact on their thinking.  In sum, there was no substantial likelihood of a miscarriage of justice from counsel's decision not to attempt to impeach Leacock with his prior grand jury testimony.

d.  <u>Prearrest silence</u>.  The defendant argues that certain of the prosecutor's questions during cross-examination of the defendant, as well as the prosecutor's discussion of those answers in closing argument, resulted in a substantial likelihood of a miscarriage of justice.

During cross-examination of the defendant, the prosecutor asked three separate times why the defendant had not returned to the United States in order to clear his name once he learned from the Internet or direct telephone calls from friends about the stories that were circulating regarding his purported involvement in the shootings.

The Commonwealth concedes that these questions, and the exploitation of them in closing argument, was error and should not have been allowed.  As the Commonwealth argues, however, the error did not create a substantial likelihood of a miscarriage of justice.

The prosecutor asked a series of questions designed to imply that the defendant remained in Trinidad, despite his awareness that he was being investigated in relation to the shootings, due to consciousness of guilt.  The questioning implied that the defendant had had an obligation to "clear his name."

There were several particularly problematic questions. First, the prosecutor asked, "[Y]ou decided that you were going to stay in Trinidad and not come back and clear your name?"  He then asked, "You said that you were being accused on the Internet of doing this thing [in Boston].  Did you do anything while you were there [in Trinidad] to clear your name?" Unprompted by defense counsel, the judge, sua sponte, gave a limiting instruction.  The judge explained,

> "a person accused of a crime has no burden of disproving that crime in any way. . . .  [Y]ou may consider the questions put to [the defendant] by [the prosecutor] in this regard of doing something or not doing anything insofar as you assess the credibility of this particular witness's testimony, but not as implying that there is any affirmative obligation on [the defendant's] part to have to do anything."

A defendant's decision not to speak with police, or not to comply with a police request for an interview, may not be used as substantive evidence of consciousness of guilt.  See Commonwealth v. Conkey, 430 Mass. 139, 141 (1999), S.C., 443 Mass. 60 (2004) and 452 Mass. 1022 (2008) ("evidence of a

defendant's refusal to comply with a police request may not be admitted because in so refusing a defendant furnishes evidence against himself, and admission of that evidence would violate art. 12 [of the Massachusetts Declaration of Rights]"). Therefore, insofar as the judge instructed that the jury could not consider the defendant's purported failure to "clear his name" as evidence of consciousness of guilt, or as any other type of substantive evidence, the first part of the instruction was correct.  The second part of the instruction, however, was erroneous, further compounding the error.

If a defendant chooses to testify at trial, the defendant's prearrest silence may be used, in certain circumstances, for impeachment purposes.  See Jenkins v. Anderson, 447 U.S. 231, 239 (1980).  See also Commonwealth v. Gardner, 479 Mass. 764, 768-769 (2018), citing Commonwealth v. Nickerson, 386 Mass. 54, 59 (1982).  "[I]mpeachment of a defendant with the fact of his pre-arrest silence should be approached with caution, and, wherever it is undertaken, it should be prefaced by a proper demonstration that it was 'natural' to expect the defendant to speak in the circumstances."  Gardner, supra at 770, quoting Nickerson, supra at 62.

In Gardner, 479 Mass. at 767-768, the defendant testified that he met the victim in order to complete a drug transaction, but a fight broke out and the defendant killed the victim in

self-defense.  We concluded that it would not have been natural for the defendant to contact the police, as doing so would have furnished evidence against him regarding the victim's death and regarding various other crimes.  See id. at 772.  See also Commonwealth v. Niemic, 472 Mass. 665, 673 (2015), S.C., 483 Mass. 571 (2019) (defendant, who claimed self-defense at trial, would not naturally have contacted police prior to arrest).  Conversely, in Commonwealth v. Barnoski, 418 Mass. 523, 534 (1994), the defendant testified that his friend had been shot by the friend's son, that the son then threatened the defendant's wife, and that, when the defendant intervened, the gun went off, hitting the son.  We held that it would have been natural for the defendant to contact the police to get help for the father, who had not yet died.  See id. at 536-537.

Here, the defendant argues that it would not have been natural for him to contact the police to give his side of the story.  The defendant asserts that he "had reasons for not coming home, such as exercising his right to a full and fair extradition proceeding under the law."  The Commonwealth concedes this point.  Unlike in Barnoski, 418 Mass. at 534, there was no immediate danger to another that could have created an incentive to contact the police to get help.  Therefore, the introduction of the testimony as impeachment evidence was an abuse of discretion, and the instruction that the jury could

consider that testimony for impeachment purposes was error.  See Gardner, 479 Mass. at 772; Niemic, 472 Mass. at 673.  Because the defendant did not object at trial, we review for a substantial likelihood of a miscarriage of justice.

The Commonwealth maintains, by contrast, that there was no substantial likelihood of a miscarriage of justice for two reasons.  First, the judge's instruction cured any error.  As stated, however, the instruction only foreclosed the use of the testimony as substantive evidence of guilt.  The instruction specifically told the jury that they could use the testimony to assess the defendant's credibility, precisely the use prohibited by Gardner, 479 Mass. at 772; Niemic, 472 Mass. at 673; and Nickerson, 386 Mass. at 60.

The Commonwealth notes that the impermissible questioning was wrapped up in a longer thread of questioning regarding the defendant's trip to Trinidad.  The mother of the defendant's fiancée purchased a plane ticket to Trinidad for the defendant on the day after the shootings, and he flew there three days later.  The defendant did not use the return ticket some weeks later, and he remained in Trinidad until his arrest and extradition.  This line of questioning was proper evidence of consciousness of guilt.  See Commonwealth v. Martin, 467 Mass. 291, 309-310 (2014).  The erroneous questioning regarding the defendant's failure to "clear his name" was to some extent

cumulative of the properly admitted evidence that the defendant fled, arguably to avoid apprehension.  See Commonwealth v. Thompson, 431 Mass. 108, 117, cert. denied, 531 U.S. 864 (2000) (improper impeachment based on prearrest silence did not create substantial likelihood of miscarriage of justice partly because evidence was cumulative with other, properly admitted evidence).

Another factor, not raised by the parties, weighs against ordering a new trial on this ground.  In his direct examination, prior to the impermissible questioning at issue, the defendant testified that, shortly after his arrival in Trinidad, a Boston police detective telephoned him.  The detective informed the defendant that he was "wanted in Boston for a triple murder," and asked the defendant when he was returning from Trinidad. The defendant testified that this was the first time he had heard about the accusations, and it took him by surprise. Therefore, the basic, impermissible point made by the prosecutor regarding the defendant's nonexistent obligation to clear his name had been raised obliquely by the defendant himself.

Considering the strength of the evidence against the defendant, we conclude that these impermissible comments by the prosecutor did not create a substantial likelihood of a miscarriage of justice.  See Thompson, 431 Mass. at 116-117 (testimony that defendant looked at floor for thirty seconds without speaking, after being told that his wife was dead, was

error, but did not create substantial likelihood of miscarriage of justice; "this testimony was a brief event in the course of a long trial, cumulative of other evidence that the defendant acted in a manner inconsistent with the behavior of an innocent person, and there was substantial evidence against the defendant" [quotations and citation omitted]); Commonwealth v. Springer, 49 Mass. App. Ct. 469, 478 (2000) (no substantial risk of miscarriage of justice in case of murder in second degree, where impermissible reference "was a vague and fleeting comment" [citation omitted]).

e. Burden shifting. The defendant also contends that the line of questioning about clearing his name constituted impermissible burden shifting. All of the cases he cites in support of this proposition, however, involve an assertion or an implication by a prosecutor that a defendant failed to meet a purported burden at trial. See Commonwealth v. Waite, 422 Mass. 792, 805 (1996) (defendant argued that judge's charge created "risk that jurors [would] evaluate the evidence with a burden on the defendant"); Commonwealth v. Amirault, 404 Mass. 221, 240 (1989) (prosecutor argued that "[the defendant] was unable to point to one single thing in the whole world that would account for why all these children and parents have turned against him"); Commonwealth v. Matos, 95 Mass. App. Ct. 343, 352 (2019) ("prosecutor impermissibly argued that key elements and facts

supporting the prosecution's case were undisputed").  See also United States v. Glover, 558 F.3d 71, 76 (1st Cir. 2009) (prosecutor, discussing evidence, stated, "Does it make sense? Or turn the question the other way:  Is there anything that doesn't make sense" [emphasis in original]).

Here, by contrast, there was no such implication.  Rather, the prosecutor implied that the defendant had had an obligation prior to arrest to clear his name.  To the extent that the prosecutor's comments implied that the defendant had any burden at trial, there was no substantial likelihood of a miscarriage of justice, because the judge immediately and unequivocally instructed the jury that the defendant had no burden.

f.  Relief under G. L. c. 278, § 33E.  We have carefully reviewed the record, pursuant to our duty under G. L. c. 278, § 33E, and discern no reason to order a new trial or to reduce the degrees of guilt.

Judgments affirmed.